# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1384V
UNPUBLISHED

| | |
|---|---|
| DAVID SMITH,<br><br>　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: December 2, 2021<br><br>Special Processing Unit (SPU);<br>Findings of Fact; Onset; Ruling on<br>Entitlement; Influenza (Flu); Shoulder<br>Injury Related to Vaccine<br>Administration (SIRVA). |

*Leah VaSahnja Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Mark Kim Hellie*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT[1]

On September 11, 2019, David Smith filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of the influenza ("flu") vaccine on October 16, 2018, he suffered a shoulder injury related to vaccination ("SIRVA") as defined on the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that a preponderance of evidence supports the conclusion that Petitioner suffered the onset of shoulder pain within 48 hours after vaccination, and that Petitioner is entitled to compensation for a right SIRVA.

## I. Relevant Procedural History

As noted above, the case was filed, activated, and assigned to the SPU in September 2019. On June 12, 2020, Respondent provided an informal review of the case, noting only that Petitioner did not seek treatment for the injury alleged until 43 days after vaccination despite seeking other intervening medical treatment. ECF No. 14.

On July 27, 2020, Petitioner conveyed a settlement demand to Respondent. ECF No. 16. On February 12, 2021, Respondent completed his formal medical review of the case and entered into settlement discussions. ECF No. 21. However, on June 28, 2021, the parties advised that they had reached an impasse. ECF Nos. 23-25.

On August 24, 2021, Respondent filed his report pursuant to Vaccine Rule 4(c), in which he opposed compensation for a Table SIRVA on the basis that Petitioner had not provided preponderant evidence of onset within 48 hours after vaccination. Respondent noted Petitioner's 36-day post-vaccination urgent care encounter for fever and gastrointestinal issues (at which time there was no mention of shoulder pain), along with the fact that he waited, in total, 43 days post-vaccination to seek medical treatment for his shoulder. Respondent also averred that "Petitioner's reported claims of onset to his medical providers several weeks after vaccination is insufficient evidence to support his claim[ed]" onset. Rule 4(c) Report (ECF No. 27) at 7.

I then directed both parties to file briefs and any other evidence that would facilitate my resolution of the disputed issues. ECF No. 28. Petitioner filed updated medical records and supplemental affidavits (Exs. 11-16), followed by his brief (ECF No. 30).[3] Respondent did not make any further filings. This matter is now ripe for adjudication.

## II. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation,

---

[3] Petitioner filed his brief slightly out of time. The deadline fell on a Friday and he filed the brief on the following Monday. It is nonetheless accepted *sua sponte*.

and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] ... did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### III. Relevant Factual Evidence

I have fully reviewed the evidence, including all medical records and affidavits, Respondent's Rule 4(c) Report, and Petitioner's brief. I find most relevant the following:

- Upon receiving the subject vaccination, Mr. Smith was sixty-five (65) years old and was generally healthy, with no history of complaints related to his left upper extremity. He was retired and resided with his wife.

- Petitioner was an established patient of Brian Edward Wysong, M.D. at the South Point Family Practice in Belmont, North Carolina. In the three years before vaccination, Petitioner sought medical care infrequently, most often for comprehensive annual exams and maintenance of his longstanding hypothyroidism.[4] Ex. 2 at 3-4; 91-234.

- On October 16, 2018, Petitioner presented to Dr. Wysong's practice to receive a seasonal flu vaccine. A medical assistant administered the flu vaccine into Petitioner's left deltoid muscle. Ex. 1 at 1; Ex. 2 at 82-83.

- Thirty-six (36) days post-vaccination, on November 21, 2018, Petitioner presented to urgent care. He reported waking up at 1:00 a.m. "shaking violently with chills," and additional symptoms of fever, dysuria, urinary urgency, and decreased appetite. He did not raise any complaints

---

[4] Respondent stated that Petitioner's hypothyroidism was a "significant" aspect of his medical history. Rule 4(c) Report at 2 (citing Ex. 2 at 81). However, Respondent did not contend that condition is an obstacle to entitlement for the injury alleged, nor do I see preponderant evidence for such.

4

   concerning his left shoulder. A physician assistant ("PA") conducted a limited physical exam which did not address the musculoskeletal system. The only neurological finding was that Petitioner was "alert." The PA assessed Petitioner with unspecified fever and pyelonephritis[5] for which she gave an intramuscular antibiotic injection.[6] She prescribed an oral antibiotic as well as an anti-nausea medication to have on hand over the upcoming holiday.[7] Ex. 2 at 66-69.

- Forty-three (43) days post-vaccination, on November 28, 2018, Dr. Wysong saw Petitioner for a chief complaint of left shoulder pain "for the past month." Dr. Wysong also recorded: "This started after getting a flu shot. He said that the flu shot hurt. It has hurt every [sic] then." Petitioner reported pain upon moving his shoulder, such as reaching for a keyboard or putting on or taking off a jacket. Motrin had not helped. On exam, Dr. Wysong observed that Petitioner had no weakness and full range of motion, but pain upon abduction. Dr. Wysong assessed left shoulder bursitis and injected a subacromial steroid injection. He told Petitioner to follow up if his symptoms worsened or failed to improve. Ex. 2 at 43-45.[8]

- Upon following up with Dr. Wysong on December 31, 2018, Petitioner reiterated that his left shoulder pain "all started with the flu shot." Since the steroid injection, he was "definitely better," but he was "still having sharp pains with reaching out or doing certain things." Dr. Wysong documented no tenderness and normal range of motion, but pain on internal and external rotation. He referred Petitioner to physical therapy ("PT"). Ex. 2 at 30-32.

- At the initial consult with physical therapist Joseph Nowak on January 2, 2019, Petitioner reported that: "Back in mid-October, I got my flu shot. The next day my left shoulder was hurting pretty bad (anterior/ lateral left shoulder) …" PT Nowak documented left shoulder flexion to 168 degrees and abduction to 165 degrees – and normal internal and external rotation, although all of those movements elicited pain. Petitioner had mild pain on

---

[5] Pyelonephritis is defined as inflammation of the kidney and renal pelvis due to bacterial infection. *Dorland's Illustrated Medical Dictionary*, available at https://www.dorlandsonline.com (hereinafter "*Dorland's*").

[6] Respondent notes that the antibiotic injection was intramuscular, but the site of administration is not noted. Rule 4(c) Report at n.1. I find insufficient evidence in the record to determine that this antibiotic was administered in the left shoulder or that it represents a potential alternative cause for Petitioner's shoulder injury, which he consistently attributed to the vaccine over one month earlier.

[7] The following day, Thursday, November 22, 2018, was Thanksgiving. *See* https://www.timeanddate.com/calendar/monthly.html%3Fyear%3D2018%26month%3D11%26country%3D1.

[8] Petitioner also reported that he "had a UTI last week, but better from that." Regardless, Dr. Wysong prescribed another 10-day course of oral antibiotics. Ex. 2 at 43, 45.

5

- palpation. He was between 1% and 20% impaired in carrying, moving, and handling objects. He was given home exercises and a plan for further therapy to "decrease inflammation." Ex. 7 at 1-3.

- After attending three PT sessions and not progressing, on January 16, 2019, Petitioner self-discharged. He planned to follow up with Dr. Wysong and seek a referral to an orthopedist. Ex. 7 at 4-7.

- On January 31, 2019, Dr. Wysong recorded that Petitioner had continued left shoulder pain, which he had aggravated a week earlier while using a crank drill underneath his house. Dr. Wysong referred to an orthopedic surgeon, Erik Johnson, M.D., for further evaluation and treatment. Ex. 2 at 17-19.

- At the February 12, 2019, initial consult with Dr. Johnson, Petitioner reported that he "developed acute onset of left shoulder pain on October 16, 2018 after a flu shot into the left deltoid region." The one steroid injection had "help[ed] him out" but did not lead to long-term improvement. Petitioner was also concerned that too many steroid injections would exacerbate his preexisting eye condition. He reported current pain of about 8/10. He was taking over-the-counter Advil, Motrin, and Tylenol. On physical exam, Dr. Johnson observed normal passive range of motion, but limited active range of motion secondary to weakness and pain. He had positive impingement signs. An x-ray of the shoulder was unremarkable. Dr. Johnson's initial impression was a left shoulder rotator cuff tear. Ex. 3 at 6-7.

- On February 18, 2019, an MRI of the left shoulder was conducted, which was "limited by some patient motion." Within the rotator cuff, the supraspinatus tendon contained an area of "partial" tearing as well as potential, "very minimal" fraying. The labrum was concerning for "a small area of tearing," and additional "minimal fraying" could not be excluded. There were no findings in the bursa, although there was possible minimal thickening and increased signal within the inferior joint capsule. The MRI could not exclude findings of early adhesive capsulitis, which would need clinical correlation. Ex. 3 at 8-9; *see also* Ex. 3 at 5 (February 21, 2019 follow-up appointment with Dr. Johnson).

- On April 25, 2019, Petitioner reported that his pain was worse as opposed to better and interfering with his sleep. Dr. Johnson instructed Petitioner to keep moving the shoulder to keep it from getting stiff. Dr. Johnson also discussed potential interventions. Petitioner decided to undergo surgery after pre-planned trips to visit his daughter and to accompany his wife to an oncology follow-up appointment. Ex. 3 at 5.

- On June 19, 2019, Dr. Johnson performed a left shoulder arthroscopy with extensive intraarticular debridement, capsular release, and subacromial decompression. The post-operative diagnosis was left shoulder adhesive capsulitis with subacromial impingement. Ex. 5 at 7-8.

- Petitioner attended a total of twenty-five (25) post-operative PT sessions between July 3rd and October 21st, 2019. *See generally* Exs. 7, 9. Upon discharge, he reported: "Doing much better overall compared to where we were. Sleeping is still the biggest problem. I get maybe 2 hours of sleep in my bed then have to switch to the recliner." He was able to don and doff clothing and drive a car for one hour without increased shoulder pain. He had achieved over 160 degrees on active scaption[9] but fell short of that goal (152 degrees) on active flexion. Ex. 9 at 24.

- Petitioner also followed up periodically with Dr. Johnson, including on September 17, 2019, when he brought "information regarding a shoulder injury related to vaccine administration." Ex. 10 at 1. Dr. Johnson recorded that this material was "a very interesting read" on a subject which he was previously "not very familiar." *Id.*

- On October 22, 2019, Dr. Johnson observed that Petitioner had normal range of motion and no impingement signs. He had "made steady improvement" but would likely "always have a little bit of stiffness and weakness in the shoulder," which Dr. Johnson assessed as a 10% impairment. Petitioner would continue a home exercise program. He had "retained an attorney in Washington, D.C." Ex. 10 at 2.

- At the next encounter with Dr. Johnson on July 27, 2020, Petitioner reported pain and stiffness associated with a driving trip, as well as some home improvement projects. The exam was similar with the addition of "very minimal" impingement signs and strength of 4/5. Ex. 11 at 1.

- At the last appointment with Dr. Johnson in the record, on April 27, 2021, Petitioner reported some ongoing stiffness. He had "very little pain at rest but some pain with activities." He could not externally rotate his left arm to put it under the pillow while sleeping on his left side. Dr. Johnson again advised that Petitioner was "the best he will be." Ex. 11 at 2.

- In his affidavit (dated October 14, 2021), Mr. Smith avers that upon receiving the October 16, 2018, flu vaccine, he "immediately felt pain and noticed that the injection site was rather high and off-center toward my back." Ex. 12 at ¶ 1. He experienced continuing discomfort which

---

[9] Scaption (also known as scapular plane elevation) describes raising an arm from the side of the body and slightly forward. Healthline, *Scaption*, https://www.healthline.com/health/scaption#definition (last accessed November 17, 2021).

7

  progressed that evening, the following day, and over the subsequent weeks. *Id.* at ¶ 2. He tried to avoid using his arm and hoped the pain would go away, but it persisted. *Id.* at ¶ 3.

- Petitioner had volunteered with Operation Christmas Child for many years. Ex. 12 at ¶ 4. But during the gift collection week from November 12th through November 19th, 2018, he was unable to load the cartons of gifts and he was limited to administrative tasks because his arm hurt so badly. *Id.* at ¶ 5.

- Petitioner does not address the November 21, 2018, urgent care encounter or his delay in seeking medical treatment for his shoulder. *See generally* Ex. 12.

- His wife recalls receiving their flu vaccines together on October 16, 2018. Ex. 13 at ¶ 1. While she did not feel any discomfort upon vaccination, she witnessed Petitioner displaying a "pained look," telling the nurse that it hurt, and commenting afterward that the injection seemed too high on his arm. *Id.* She also recalls that the next morning, Petitioner got up from bed and reported left shoulder and arm pain throughout that night. *Id.* at ¶ 2. Petitioner continued to experience pain and hoped it would get better, but it never did. *Id.*

- Petitioner's son, who lives several hundred miles away, recalled that his mother mentioned Petitioner's shoulder pain during a phone conversation "the day after the shot." Ex. 14 at ¶ 1.

- A friend who also volunteered with Operation Christmas Child recalled that normally Petitioner was very active and helpful in the loading of the boxes into the trucks. Ex. 15 at ¶ 1. However, during in November 2018, he could only complete paperwork because his shoulder hurt too much.

- Another friend recalled that "in the fall of 2018," Petitioner and his wife recounted his left shoulder pain beginning immediately after a flu vaccine. Ex. 16.

## IV.   Findings of Fact Regarding Onset

In opposing compensation for a Table SIRVA, Respondent only contended that Petitioner has not established the requisite onset of shoulder pain within 48 hours after vaccination. Rule 4(c) Report at 7 (citing 42 C.F.R. §§ 100.3(a)(XII)(A), (c)(10)(ii)).

Respondent noted that Petitioner waited forty-three (43) days to pursue medical treatment for his shoulder. Rule 4(c) Report at 7. Mr. Smith's medical records, affidavits, and legal brief fail to address this delay. However, I have previously recognized that there

are a variety of reasonable explanations for why a SIRVA petitioner might delay treatment, such as "thinking his/her injury will resolve on its own." *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021) (finding that a petitioner developed shoulder pain within 48 hours after vaccination, despite the fact that she waited nearly five months to seek medical attention). Such a delay in treatment, while relevant to damages (since it tends to establish a milder injury), is not unprecedented for SIRVA claims.

More notable is the intervening medical encounter for unrelated issues 37 days after vaccination, at which point the shoulder pain could reasonably be characterized as persistent and perhaps warranting medical attention – but was not mentioned. Petitioner has not offered any explanation for why this medical record does not address his alleged shoulder pain. However, Respondent admits that the record specifically concerned "emergency care for a fever and gastrointestinal issues." Rule 4(c) Report at 7. Moreover, the Federal Circuit has recognized that a medical record can be "silent" as to either the existence or nonexistence of a particular symptom – and that this silence does not defeat a contrary finding supported by reasonable sworn testimony. *Kirby*, 997 F.3d at 1383. Here, the urgent care record is clearly focused on Petitioner's acute infection and does not address his musculoskeletal system. It thus does not prove or disprove the existence of shoulder pain, which Petitioner indeed reported to his primary care provider just one week later after the Thanksgiving holiday.

Respondent also argued that Petitioner's "reported claims of onset to his medical providers several weeks after vaccination are insufficient evidence to support his claim that his shoulder pain began within 48 hours of vaccination." Rule 4(c) Report at 7. But as previously noted, this argument ignores the fact that even a medical history provided to a petitioner's provider, and in the context of seeking medical treatment, has some indicia of reliability. *Hartman v. Sec'y of Health & Human Servs.*, No. 19-1106V, 2021 WL 4823549, at *5 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) (crediting the claimant's history of the onset of her shoulder pain, within subsequent medical records focused on diagnosis and treatment of said shoulder pain), citing *Cucuras*, 993 F.2d at 1528.

Furthermore, since Respondent filed his Rule 4(c) Report, several other individuals have offered their own independent recollections of onset. This includes Petitioner's wife, who remembers his immediate and persisting pain, and the fellow volunteer, who observed Petitioner's limitations due to shoulder pain in mid-November 2018 (prior to both the urgent care visit and the first medical attention for shoulder pain).

In sum, the record contains preponderant evidence that Mr. Smith developed left shoulder pain within 48 hours after vaccination.[10]

## V. Other Table Requirements and Entitlement

In light of the lack of other objections and my own review of the record, I find that Petitioner has established the other requirements for a Table SIRVA claim. Specifically, there is not a history of prior shoulder pathology that would explain his injury. 42 C.F.R. § 100.3(c)(3)(10)(i). There is no evidence of any other condition or abnormality that represents an alternative cause. 42 C.F.R. § 100.3(c)(3)(10)(iii). The medical records and affidavits support that his shoulder pain and reduced range of motion were limited to the left shoulder. C.F.R. § 100.3(c)(3)(10)(iv). The contemporaneous vaccination record reflects the site of administration as his left deltoid. Ex. 1; Sections 11(c)(1)(A) and (B)(i). Petitioner has not pursued a civil action or other compensation. Ex. 8 at ¶ 1; Section 11(c)(1)(E). Finally, Petitioner suffered the residual effects for more than six months after vaccination and moreover, underwent hospitalization and surgical intervention for the injury alleged. Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## VI. Conclusion

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. A subsequent order will set further proceedings towards resolving damages.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[10] However, Petitioner's delay in seeking treatment – despite access to healthcare providers – does support that his pain was less severe, which is relevant to the determination of an appropriate damages award.