# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 19-1384V
UNPUBLISHED

| | |
|---|---|
| DAVID SMITH,<br><br>     Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: June 29, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu);<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA). |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Mark Kim Hellie, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On September 11, 2019, David Smith filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine received on October 16, 2018, he suffered a shoulder injury related to vaccination ("SIRVA") as defined on the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Following my ruling on entitlement in Petitioner's favor in December 2021, the parties quickly reached an impasse concerning the appropriate award of damages, and thus have submitted that issue to my final determination. For the following reasons, I find that Petitioner is entitled to a damages award of **$129,207.48 (representing $125,000.00 for past pain and suffering, $3,748.74 for future pain and suffering, and $458.74 for past unreimbursed expenses).**

## I.   Relevant Procedural History

On December 2, 2021, I found that Petitioner was entitled to compensation for a Table SIRVA. Entitlement Ruling (ECF No. 31).[3] I noted, however, that his evident delay in seeking medical treatment tended to establish a less severe degree of pain (which would in turn impact damages to be awarded). *Id.* at 9 and n. 10. On February 14, 2022, Petitioner reported that the parties' respective valuations of damages were too far apart, and I approved the parties' proposed schedule to submit any additional evidence and briefing. Status Report (ECF No. 35); Scheduling Order (Non-PDF).

On March 16, 2022, Petitioner filed a Damages Brief (ECF No. 38), unreimbursed expenses documentation (Ex. 17), and a supplemental damages affidavit (Ex. 18). On April 18, 2022, Respondent filed his Response (ECF No. 39). On May 2, 2022, Petitioner filed a Reply (ECF No. 40). The matter is now ripe for adjudication.

## II.   Authority

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

---

[3] My prior summary of the underlying facts and the procedural history as set forth in the Ruling on Entitlement, are fully incorporated and relied upon herein.

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### III.     Prior SIRVA Compensation Within SPU[5]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that the petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[7] Agreement |
|---|---|---|---|---|
| Total Cases | *88* | *1,223* | *28* | *967* |
| Lowest | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| 1st Quartile | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| Median | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| 3rd Quartile | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| Largest | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain.

---

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## IV.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including all medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I also have taken into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances of this case.

### A.    The Parties' Arguments

The parties agree that Petitioner should be awarded $458.74 for past unreimbursed expenses. Brief at 1; Response at 1; *see also* Ex. 17 (supporting documentation). Thus, the only area of disagreement concerns the appropriate amount and scope of compensation for Petitioner's pain and suffering, past and future.

Upon receiving the subject vaccination, Petitioner was 66 years old. Ex. 1 at 1.[9] His prior medical history is non-contributory and therefore not included in the parties' damages briefing. The parties further agree that the treatment course for his SIRVA included over-the-counter pain medications, one steroid injection, three initial physical therapy ("PT") sessions, an MRI, consultations with an orthopedic surgeon, surgical intervention, and 25 subsequent PT sessions. Brief at 5-9; Response at 2-5.

In requesting $140,000.00 for past pain and suffering, Petitioner characterizes his initial pain as "severe" and "debilitating." Brief at 10. He explains that for the first 43 days of his injury, he delayed medical treatment while attempting to continue serving as the primary caregiver for his wife, who had been fighting a rare form of cancer for eight years; maintaining their household; and fulfilling their annual volunteer commitment with Operation Christmas Child. *Id.* at 3-4, 12. He also recalls reporting shoulder pain during the one intervening urgent care encounter for a UTI. *Id.* at 12-13. He also asserts that his "severe" and "debilitating" pain persisted without relief for a total of eight months leading up to his surgery. *Id.* at 13-14.

Petitioner avers that he is "reasonably comparable" to the petitioner in *Reed* (awarded $160,000.00 for past pain and suffering), on the grounds that both suffered pain without lasting relief "for an extended period" prior to surgery, had ongoing pain and limitations after surgery. Brief at 15.[10] Petitioner allows that his injury "may not be as severe as Ms. Reed's injury," but avers that it was more severe than the petitioner's injury in *Wilson*, whose "not extensive" post-surgical treatment and limitations warranted $130,000.00 for past pain and suffering. *Id.* at 15-16.[11]

Petitioner also requests $2,500.00 per year[12] for future pain and suffering based on his orthopedist's documentation of permanent post-surgical shoulder limitations, rated at 10%. Brief at 1, 16-17; Reply at 4-6, n. 2.

---

[9] Petitioner's Entitlement Brief (ECF No. 30), the Ruling on Entitlement (ECF No. 31), and Petitioner's Damages Brief (ECF No. 38) inadvertently state that he was *65* years old upon vaccination.

[10] Citing *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

[11] Citing *Wilson v. Sec'y of Health & Hum. Servs.*, No. 19-0035V, 2021 WL 1530731, at *5 (Fed. Cl. Spec. Mstr. Mar. 18, 2021).

[12] Citing Social Security Administration, *Retirement & Survivors' Benefits: Life Expectancy Calculator*, https://www.ssa.gov/cgi-bin/longevity.cgi (last accessed May 16, 2022) (providing that Petitioner has a life expectancy of an additional 15.5 years).

Respondent offers $101,000.00 for only past pain and suffering, with no future component. Response at 1. He maintains that the initial absence of documented medical attention establishes a less severe injury. Brief at 7. Respondent correctly notes that the urgent care encounter does not document shoulder pain – but he does not address Petitioner's explanation for the initial delay, or the severity of his injury in the subsequent seven months leading up to surgery. Respondent suggests that Petitioner's course is comparable to *Knudson* (awarding $110,000.00 for past pain and suffering), with a "slight reduction" due to Mr. Smith's delay in seeking treatment. Response at 8.[13]

In opposing any award for future pain and suffering, Respondent emphasizes that Petitioner's active treatment course ended after his last post-surgical PT session, which occurred one year and five days after vaccination, on October 21, 2019. Reply at 7-8, n. 2. Thereafter, Petitioner followed up with his orthopedist only once in 2020 and once in 2021, and he has not submitted updated medical records from his primary care provider. *Id.* at 8.

Respondent also argues that Petitioner's permanent shoulder loss of function, rated at just 10%, is not sufficient to warrant a future award. Response at 9-10, citing to *Curri*, (22.5% disability and $550.00 per year)[14] and *Hooper* (50% disability and $1,500.00 per year).[15] Petitioner does not respond to this argument in his Reply. Petitioner instead emphasizes that medical documentation of the permanent injury is highly probative toward awarding future pain and suffering. Reply at 4-6, citing *Curri* and *Binette* ("similar" disability as in *Curri* and $1,000.00 per year).[16]

---

[13] *Knudson v. Sec'y of Health & Hum. Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018).

[14] Respondent inadvertently states that in *Reed*, the special master denied future pain and suffering to the petitioner because she "claimed a 22.5 percent loss of use of her arm." Response at 9. Instead in *Reed*, the special master denied future pain and suffering because the petitioner "ha[d] not submitted a statement or medical record from a medical professional" to support her own assertion of permanent injury. 2019 WL 1222925, at *17. The intended citation is most likely to *Curri*, in which a petitioner whose treating orthopedist confirmed a permanent 'scheduled loss of use' of 22.5% percent" was awarded $550.00 per year. *Curri v. Sec'y of Health & Hum. Servs.*, No. 17-0432V, 2018 WL 6273562, *6 (Fed. Cl. Spec. Mstr. Oct. 31, 2018).

[15] *Hooper v. Sec'y of Health & Hum. Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019).

[16] *Binette v. Sec'y of Health & Hum. Servs.*, No. 17-0432V, 2019 WL 1552620, at *14 (Fed. Cl. Spec. Mstr. March 20, 2019).

**B.     Analysis**

A careful review of the medical review supports the determination that after the October 2018 vaccination, Mr. Smith's initial shoulder pain was moderate. I do not find sufficient evidence to accept or reject that Petitioner *reported* his shoulder pain during the urgent care encounter 36 days after vaccination.[17] Petitioner acknowledges that at the time, his UTI symptoms were "more urgent"[18] and that he waited another six days for an appointment to address his shoulder. Brief at 13. Petitioner also explains that he first attempted to manage his pain while attending to his wife's longstanding cancer,[19] household responsibilities, and an annual volunteer commitment.[20] But the available evidence suggests that his pain was initially manageable, then progressed to the point of warranting focused medical attention and a steroid injection 42 days after vaccination. Ex. 2 at 43-45.

The subsequent history is consistent with a fairly moderate SIRVA injury. One month later, his shoulder was "definitely better" but featured "sharp pains with reaching out or doing certain things." Ex. 2 at 30-32. At the first of three PT sessions, he was assessed to have between 1 – 20% impairment. Ex. 7 at 103. Petitioner expressed concern that further steroid injections would exacerbate a preexisting eye condition. He continued to take over-the-counter medications for pain rated at 8/10, and disrupted sleep. Ex. 3 at 5-7. Eight months after vaccination, in June 2019, Petitioner underwent a left shoulder arthroscopy with extensive intraarticular debridement, capsular release, and subacromial decompression. The post-operative diagnosis was adhesive capsulitis with subacromial impingement. Ex. 3 at 4-5; Ex. 5 at 7-8.

After surgery, Mr. Smith made steady improvement, to the point that he could perform most activities of daily living without pain. After 25 post-operative PT sessions, Petitioner still had ongoing pain which disrupted his sleep. He slept in a recliner chair and

---

[17] Ex. 18 at ¶¶ 5-6; *see also* Ex. 2 at 68 (urgent care records documenting ("UTI") treated by antibiotic, but not left shoulder pain or the antibiotic administration site).

[18] The medical record provides that Petitioner had fever, gastrointestinal issues, dehydration, some stomach "rumbling," no stomach pain, and "some dysuria and urinary urgency." Ex. 2 at 66-69. Petitioner also recalls being so ill that he had difficulty walking into the urgent care clinic. Ex. 18 at ¶ 4. However, I do not see sufficient evidence to support Petitioner's characterization that he was in "terrible pain" from the UTI. Brief at 13.

[19] *See* Exs. 12-14 (original affidavits referencing his wife's cancer diagnosis in 2010 and "many" subsequent cancer treatments); Ex. 18 at ¶¶ 1-4, 11 (Petitioner's supplemental affidavit describing his responsibilities, including driving his wife to oncology appointments 170 miles away from their home).

[20] I recognize the recollections that during the volunteer shift, Petitioner modified his role and only performed paperwork. Ex. 12 at ¶ 5; Ex. 15 at ¶ 1. Petitioner is noted to be right-handed. Ex. 7 at 1.

required Percocet to sleep on "some" nights. Ex. 9 at 24; Ex. 18 at ¶ 8. The orthopedist endorsed that Petitioner would "always have a little bit of stiffness and weakness in the shoulder as a result of the shoulder injury related to vaccine administration," specifically loss of "about 10% of motion to forward flexion, external rotation, and internal rotation," which warranted an ongoing home exercise program. Ex. 10 at 2 (October 2019); *see also* Ex. 11 at 1-2 (similar assessments in July 2020 and April 2021); Ex. 18 at ¶ 13 (March 2022 affidavit). Now, approximately four and one-half years after vaccination, Petitioner's primary complaint is an inability to externally rotate his left arm to place under his pillow in bed, while sleeping on his left side, which disrupts his sleep and causes fatigue during the day. Ex. 11 at 2. However, there is no evidence of ongoing formal treatment or prescription pain medication. *See also* Ex. 18 at ¶¶ 7-8.

Respondent's comparison to *Knudson* is inapt. In that case, the special master highlighted the facts that medication, physical therapy, and time were effective – to the point that the petitioner's shoulder pain had improved "by about 95%" six months into the course. *Knudson,* 2018 WL 6293381, at *8. Ms. Knudson improved even further after surgery and was deemed recovered and pain-free by ten months after vaccination. *Id.* at *9. Because Ms. Knudson's injury was demonstrably more severe, the sum awarded therein is a bit too low for this case.

Petitioner's citation to *Wilson* is more persuasive, primarily because that petitioner's condition progressed and did not achieve meaningful relief until after surgery. *Wilson,* 2021 WL 1530731, at *3. Ms. Wilson's first documented medical attention was also comparably delayed - 32 days after vaccination, compared to 42 days after vaccination in the present case. However, Mr. Smith also underwent a steroid injection and a greater number of PT sessions. I also recognize that the injury complicated Mr. Smith's ability to drive his wife to specialized cancer treatments and to maintain their home. **Overall, I find that $125,000.00 is an appropriate award for Mr. Smith's past pain and suffering.[21]**

---

[21] Petitioner also cites to *Reed* while simultaneously acknowledging that his own injury "may not be as severe." Brief at 16. Indeed, many cases lack the unique facts recognized by the special master in *Reed* – including a failed surgery, long-term reliance on prescription pain medication and pain counseling, and specific personal circumstances that made her physical limitations more disruptive. *See e, g.*, *Stoliker v. Sec'y of Health & Hum. Servs.*, No. 17-0990V, 2020 WL 5512534, *4 (Fed. Cl. Spec. Mstr. Aug. 7, 2020); *Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956, *17 (Fed. Cl. Spec. Mstr. May 21, 2020); *Gunter v. Sec'y of Health & Hum. Servs.*, No. 17-1941V, 2020 WL 6622141 (Fed. Cl. Spec. Mstr. Oct. 13, 2020); *Wilson*, 2021 WL 1530731 at *5. I again "emphasize that *Reed's* applicability is limited and there are numerous other opinions which may offer more relevant guidance as to the appropriate quantum of damages." *Schmitt v. Sec'y of Health & Hum. Servs.*, No. 19-0021V, 2021 WL 4470101, n. 8 (Fed. Cl. Spec. Mstr. Aug. 30, 2021).

There are very few reasoned decisions addressing future pain and suffering. Petitioner has, however, justified his request for this component, primarily because his treating orthopedist has diagnosed him with a permanent post-surgical disability resulting from the vaccine injury. *Accord Curri*, 2018 WL 6273562 at *2; *Binette*, 2019 1552620 at *14; *Hooper*, 2019 WL 1561519 at *9-10. Here, orthopedist documented that Mr. Smith's left shoulder continues to have limited forward flexion, internal rotation, and external rotation, resulting in a 10% disability, and has maintained this assessment despite the gaps between their appointments.

The orthopedic records and Petitioner's affidavit also explain that this disability primarily impedes a particular sleep position, which causes daily fatigue. It does not equate to the level of disability and personal impacts seen in *Hooper* or *Binette* – and certainly not Mr. Smith's even higher request of $2,500.00 per year. Rather, his disability is more similar to that in *Dawson-Savard*, in which the injured petitioner – who experienced permanently-decreased range of motion and continued pain but remained able to perform all physical requirements of her job as a registered nurse – was awarded $500.00 per year in future pain and suffering.[22] Mr. Smith's disability is also similar to that in *Danielson*, in which the injured petitioner – who exhausted treatment options and periodically reported pain with movement – was awarded $250.00 per year.[23]

**Here, I will award compensation for Petitioner's future pain and suffering, but at a lower amount of $250.00 per year, for his expected life expectancy of approximately 16 years,[24] for an initial total of $4,000.00. When reduced to present value, utilizing the multi-pronged approach I have employed in prior cases, the final total is $3,748.74.[25]**

---

[22] *Dawson-Savard v. Sec'y of Health & Human Servs.*, No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July. 14, 2020).

[23] *Danielson v. Sec'y of Health & Human Servs.*, 2020 WL 8271642 (Fed. Cl. Spec. Mstr. Dec. 29, 2020).

[24] Using the life expectancy calculator found on the Social Security Administration's website, Petitioner is expected to live another 15.5 years. https://www.ssa.gov/cgibin/longevity.cgi (last visited June 10, 2022).

[25] A one percent discount rate is used for the first fifteen years, with a two percent discount rate used for any additional years. *Curri*, 2018 WL 6273562, at *7. As in *Curri*, an online present value calculator was used to perform the appropriate calculations. 2018 WL 6273562, at *7, n. 4; *see also* https://financialcalculators.com/present-value-of-an-annuity-calculator (compounding annually) (last visited June 10, 2022). Utilizing a one percent discount rate for years 1 through 15, the total of $3,750.00 ($250 multiplied by 15) is reduced to a net present value of $3,499.01. Utilizing a two percent discount rate for year 16, the total amount of $8,250.00 ($250 multiplied by 1) is reduced to a net present value of $249.73.

## V.     Conclusion

Based on the record as a whole and the parties' arguments, I award Petitioner a lump sum payment of **$129,207.48 (representing $125,000.00 for past pain and suffering, $3,748.74 for future pain and suffering, and $458.74 for past unreimbursed expenses).** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[26]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[26] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.